IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARSHA JACKSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:20-cv-00967-M |
| | § | |
| CITY OF DALLAS, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant City of Dallas' Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), on Plaintiff's only remaining claim, one purportedly arising under the federal Constitution [ECF No. 35]. For the following reasons, the remainder of the Motion is GRANTED.

I. **Background**

On property near Plaintiff's residence, Blue Star Recycling, LLC recycled and stored asphalt shingles, which eventually led to the creation of a huge pile of debris that came to be known as "Shingle Mountain." In December of 2018, the City of Dallas filed a lawsuit against Blue Star and the property owners to stop the discharge of pollutants and industrial activity on the properties [ECF No. 37 at 31–32, and 41]. Separately, Plaintiff sued Blue Star and a property owner, alleging they had violated the Resource Conservation and Recovery Act [ECF No. 1]. Plaintiff later added claims against the City of Dallas, including the subject claims under 42 U.S.C. § 1983 [ECF No. 13] alleging that the Dallas City Council's zoning and spending decisions reflected disparate treatment based on race and ethnicity, in violation of the Equal

Protection Clause of the Fourteenth Amendment. Specifically, Plaintiff contends she has stated two plausible Equal Protection claims; the first, based on the City Council's zoning the part of the property at issue in this lawsuit for Industrial Manufacturing, and the second, based on the alleged refusal of the City Council to fund the removal of Shingle Mountain.

## II. **Legal standard**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must have pled "a short and plain statement of the claim showing that he is entitled to relief." Fed. R. Civ. P. 8(a)(2). In analyzing such a motion, the Court accepts well-pleaded facts as true, and views them in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502 (5th Cir. 2014). However, the Court will not "accept the plaintiff's legal conclusions as true." *Id.* at 502.

The question before the Court is whether Plaintiff's Amended Complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Howe v. Yellowbook, USA*, 840 F. Supp. 2d 970, 975 (N.D. Tex. 2011) (Lynn, J.) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In order for the Amended Complaint to be plausible on its face, Plaintiff must have pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Lone Star Natl. Bank, N.A. v. Heartland Payment Sys., Inc.*, 729 F.3d 421, 423 (5th Cir. 2013) (*quoting Highland Capital Mgmt., L.P. v. Bank of Am., N.A.*, 698 F.3d 202, 205 (5th Cir. 2012)).

## III. **Traceability**

The City first argues that Plaintiff does not have standing because she has not alleged an injury traceable to any conduct of the City. For a plaintiff to have Article III standing, there must be a causal connection between the alleged harm and the defendant's conduct, such that the injury is fairly traceable to the challenged conduct, rather than the result of a third party's

independent action. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000); U.S. Const. Art. 3, § 2, cl. 1. Plaintiff alleges that she has been injured by Shingle Mountain's effects on her health and the environment and on her property value.

The Court finds that the injuries alleged by Plaintiff are traceable to conduct of the City. If the City Council had not zoned the property for Industrial Manufacturing, Blue Star could not have operated. Similarly, if Shingle Mountain had been removed and remediated, Plaintiff would not have continued to suffer harm as a result of its presence. The City argues that the real cause of Plaintiff's injuries were actions of Blue Star, but the traceability standard is much lower than is the standard for proximate cause, and Blue Star was authorized to use the property by the City Building Official. *See Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 74–77 (1978) (finding that a but for causal connection between plaintiff's injury and defendant's act satisfied traceability); *Lexmark Intern., Inc. v. Static Control Components, Inc*., 572 U.S. 118, 134 at n. 6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct."); *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) ("[A]n indirect causal relationship will suffice, so long as there is a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant.") (quotations omitted); [ECF No. 43 at 177]. Plaintiff's alleged injuries are traceable to the City's actions, and Plaintiff thus has standing.

IV. **Specific Equal Protection claims**

A. **The zoning decision**

Under the Supreme Court's decision in *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 694–95 (1978), a plaintiff attempting to hold a municipality liable for constitutional violations

must allege facts sufficient to permit a reasonable inference that official policy of a state actor was the moving force behind the violation. In 2007, the City rezoned the property from Industrial Research to Industrial Manufacturing zoning, permitting the most intense manufacturing use [ECF No. 43 at 150]. This, Plaintiff contends, is the "policy" that provided the "moving force" behind the issuance of a certificate of occupancy in 2018 that allowed Blue Star to have an asphalt shingle salvage operation on the property.

However, the City Council's approval of the re-zoning was explicitly "subject to deed restrictions volunteered by" the party who was applying for the zoning change.[1] [ECF No. 43 at 150]; [*id*. at 169] (reflecting the City Council accepting the deed restrictions). "The deed restrictions volunteered by applicant restrict the uses to those in the IR Industrial Research District and allow the industrial (outside) potentially incompatible use *limited to wood processing* by Specific Use Permit." [*Id*. at 150] (emphasis added); *see*[ECF No. 37 at Appx. 159] (listing the industrial uses allowed in an Industrial Research zone). Wood processing is not a use of which the Plaintiff complains. The deed restrictions are binding on all who acquire any right, title, or interest in the property [ECF No. 43 at 173]. Both parties agree that the deed restrictions were in effect at the time of Blue Star's occupancy of the property, and that the deed restrictions prohibited a shingle recycling facility or solid waste landfill on the site. [ECF No. 13 at ¶ 119] (stating, in Plaintiff's Amended Complaint, that "[t]he deed restrictions *prohibit* a shingle recycling facility or a solid waste landfill on the site.") (emphasis added); [ECF No. 52 at 3 and 7] ("The zoning change from I[ndustrial] R[esearch] to I[ndustrial] M[anufacturing] had no effect to increase allowed uses, except wood processing, because the deed restrictions limited the uses to those of an I[ndustrial] R[esearch] district. . . . The alleged 2018 actions were

---

[1] The applicant, who wanted to run a wood processing facility on the site, was BMB, Ltd. [ECF No. 43 at 150].

*contrary to City policy adopted in 2007* with the zoning and deed restrictions and do not satisfy *Monell.*") (emphasis added).

Plaintiff argues that, "[a]bsent the City Council enactment of the I[ndustrial] M[anufacturing] zoning for the [property], the City *staff* could not have issued the certificate of occupancy required for the operation of the solid waste storage and processing facility." [ECF No. 42 at 23] (emphasis added). That allegation is an attempt to plead that the 2007 actions of the City Council were a but for cause of the alleged harm to Plaintiff. However, the moving force element of *Monell* requires more. As the Fifth Circuit put it in *Mason v. Lafayette City-Parish Consol. Government*, "[t]he moving force inquiry imposes a causation standard higher than but for causation. Under the culpability requirement, if the policy is facially lawful, a plaintiff must also show that the municipality promulgated [the policy] with deliberate indifference to the known or obvious consequences that constitutional violations would result." 806 F.3d 268, 280 (5th Cir. 2015) (footnotes and quotations omitted); *accord Fraire v. City of Arlington,* 957 F.2d 1268, 1281 (5th Cir. 1992) ("[A] direct causal connection must exist between the policy and the alleged constitutional deprivation. This connection must be more than a mere but for coupling between cause and effect. To form the basis of liability under § 1983, a municipal policy must be affirmatively linked to the constitutional violation and be the moving force behind it."). In *Board of County Comm'rs of Bryan Cnty. v. Brown*, the Supreme Court found that the plaintiff had not pled a sufficient causal link to satisfy *Monell* where the sheriff was alleged to have hired, without adequate screening, an officer who used excessive force. 520 U.S. 397, 415 (1997). The Court found that the plaintiff had "not demonstrated that [the sheriff's] decision reflected a conscious disregard for a high risk that [the officer] would use excessive force." *Id*. Here, it is undisputed that the activity in which Blue Star engaged was not

5

authorized by the City Council's 2007 rezoning decision. The Plaintiff must allege facts that, if true, would show that the City Council consciously disregarded the risk of harm to Plaintiff from that decision. Plaintiff's Amended Complaint contains no factual allegation that could support a finding that the City Council consciously disregarded the possibility that its zoning decision, including the deed restrictions, would result in the issuance of a certificate of occupancy not in compliance with these restrictions, or that a future occupant of the property would operate in violation of the deed restrictions. Because Plaintiff has not alleged that the City acted with conscious disregard for the possibility of the harm of which Plaintiff complains, it has not pled that the City Council's 2007 actions were a moving force behind Plaintiff's alleged injuries, nor would the facts she has pled support such an allegation.

The question then becomes whether the 2018 issuance of a certificate of occupancy can serve as the policy which was the moving force behind Plaintiff's alleged injuries. The September 17, 2018 certificate of occupancy allowed Blue Star to operate on the property [ECF No. 43 at 177]. The certificate was signed by Dallas's Building Official, Phillip Sikes. [*Id.*]; *see* Dallas City Code § 51A-2.102(14) (stating that the Building Official is a person designated by the City Manager). Only the Building Official is authorized to issue certificates of occupancy. Dallas City Code § 51A-104. The City's state court petition, and its briefing in this case, make clear the City's position that Blue Star made inaccurate representations to obtain the certificate.[2] [ECF No. 37 at Appx. 038–039] (alleging that Blue Star failed to obtain a certificate of occupancy before using or changing the use of the property, and that Blue Star used the property for a non-permitted purpose); [ECF No. 35 at 23] (stating that the certificate of occupancy "was issued based on inaccurate representations made to the City and . . . was revoked within months

---

[2] Plaintiff seems to agree that Blue Star did not have legal authorization for its activity on the property. *See generally* [ECF No. 13] (referring repeatedly to the landfill as "illegal").

of its issuance"). The City also argues, however, that, even if the certificate of occupancy had been improperly issued, allowing for the operation of a solid waste storage and processing facility, the City cannot be held liable, because no policymaker or official city policy served as the moving force behind issuance of the certificate [ECF No. 52 at 7].

Only the decisions of policymakers may subject a municipality to liability under § 1983. *Worsham v. City of Pasadena*, 881 F.2d 1336, 1340 (5th Cir. 1989). The issue of whether a person is a policymaker is one for the court. *Id*. at 1340 n. 8.

A governing body may delegate a policymaking role to a city official in one of two ways. First, it may do so formally, through, for example, an express statement or job description. *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984); *Swann v. City of Dallas*, 922 F. Supp. 1184, 1204 (N.D. Tex. 1996). The Dallas Development Code sets out the authority of the Building Official, who may, consistent with the City Code, (1) issue permits, (2) issue certificates of occupancy, and (3) otherwise enforce the provisions of the Code. Dallas City Code § 51A-3.105; *see also* Dallas City Code § 52-108.1 ("Whenever the codes provide that anything may or shall be done upon the approval of or subject to the direction of the building official . . ., this language shall be construed to give the building official . . . only the authority to determine whether the regulations established by the codes have been complied with and shall not be construed as giving the building official . . . discretionary powers."). In a case from this district, it has been determined that that the Garland Building Official was not a policymaker. *Roan Bros. Tile Co. v. City of Garland*, No. 3:04-cv-1090-B, 2006 WL 8437017, at *7 (N.D. Tex. Jan. 12, 2006). Garland's City Code gave the Building Official "the authority to render interpretations of this code and to adopt policies and procedures in order to clarify the application of its provisions." *Id*.; *Roan Bros.*, No. 3:04-cv-1090-B, [ECF No. 117-5 at 13]

(N.D. Tex. Aug. 5, 2005) (containing excerpts from the Garland Code then extant).  Because the Garland Building Official's decisions were subject to review by the City's Board of Appeals or Building and Fire Codes Board, the Court determined that he was not a policymaker under *Monell*.  *Roan Bros.*, 2006 WL 8437017, at *7; *see Martinez v. City of Richland Hills*, 846 F. Appx. 238, 246 (5th Cir. 2021) ("There is a fundamental difference between decision makers and policymakers.  Discretion to exercise a particular function does not necessarily entail final policymaking authority over that function.") (quotations omitted) (citing *Bolton v. City of Dallas*, 541 F.3d 545, 548–49 (5th Cir. 2008)).  The Dallas Building Official's decisions are reviewable, if appealed, by the Zoning Board of Adjustment.  Dallas City Code § 51A-3.102; *Departmental Boards and Commission Agendas: Zoning Board of Adjustment*, DALLAS CITY HALL, https://dallascityhall.com/government/meetings/Pages/zoning-board.aspx (last visited July 22, 2021).  The City Council has not formally delegated policymaking authority to the Dallas Building Official.  The Code does not authorize the Building Official to contravene actions of the City Council.

The second way that a court may delegate policymaking authority is informally, by encouraging or acknowledging the agent in a policymaking role.  *Bennett,* 728 F.2d at 769.  Plaintiff has not alleged that this occurred.

The issuance of the certificate of occupancy seemingly allowed for the violation of restrictions placed on the property by the City Council when the zoning change was made.  But the Building Official's issuance of the certificate of occupancy cannot serve as the moving force for a constitutional violation under *Monell* because the Dallas Building Official is not a policymaker.  *See Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) ("[I]solated

8

unconstitutional actions by municipal employees will almost never trigger liability."); [ECF No. 13 at ¶ 86] (admitting that "City staff employees issued occupancy permits").

### B. Failure to remove

Plaintiff also contends that the City violated the Equal Protection Clause by refusing to obligate City funds to remove Shingle Mountain. A plaintiff's claim under § 1983 based on the Equal Protection clause requires "[p]roof of racially discriminatory intent or purpose" in the decision at issue. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265 (1977). Disparate treatment alone will not suffice, unless the pattern that emerges is unexplainable on grounds other than race. *Id*. at 266. "Because direct evidence of discriminatory purpose is rarely available, courts must make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' " *Jim Sowell Constr. Co. v. City of Coppell, Tex.,* 61 F. Supp. 2d 542, 546 (N.D. Tex. 1999) (quoting *Arlington Heights,* 429 U.S. at 266). "The court must therefore look at the totality of the relevant evidence to determine whether invidious discriminatory purpose was a motivating factor for the decision." *Id.* (citing *Washington v. Davis,* 426 U.S. 229, 242 (1976)). In *Arlington Heights*, the Supreme Court enumerated five non-exhaustive factors to analyze when deciding whether a decision had the requisite discriminatory intent; (1) the historical background of the decision, (2) the sequence of events leading to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative or administrative history, "especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 267–68.

Plaintiff urges that the City's failure to remove Shingle Mountain upon Plaintiff's request was an action taken with discriminatory intent. First, Plaintiff references the City's removal of

the Argos concrete plant in the Trinity Groves area, which Plaintiff alleges is a predominantly white community. Plaintiff further asserts that the City paid to remove lead soil contamination from Belo Garden Park in downtown Dallas, which is also allegedly in a predominantly white neighborhood. Plaintiff complains that, in contrast, the City Council refused to use City resources to remove Shingle Mountain when it was requested to do so in September of 2019 [ECF No. 13 at ¶ 97]. At that time, the City was engaged in state court litigation to halt Blue Star's activity on the property, and to obtain a court-ordered cleanup of Shingle Mountain [ECF No. 37]; [ECF No. 61-1]. In fact, on April 10, 2019, the City obtained an Order from the state court that Blue Star remove, within ninety days, "all asphalt roofing shingles and ground material from shingles, and wood pallets on the property[,] and all debris, waste, refuse, and other materials associated with the items listed above." [ECF No. 37 at 57–59]. Plaintiff cites to no authority that the City was required to remove Shingle Mountain while it was engaged in litigation seeking to hold others responsible to do so. There are no allegations that similar litigation was pending regarding Trinity Groves or the Belo Garden Park, which would be required to make those circumstances similar to that involved here. *See Anokwuru v. City of Houston*, 990 F.3d 956, 965 (5th Cir. 2021) ("[T]o state a claim of racial discrimination under the Equal Protection Clause and § 1983, a plaintiff must plausibly allege . . . *that he was treated differently than persons similarly situated to him* . . . .") (emphasis added).

Analysis of the *Arlington Heights* factors before the Court demonstrates that Plaintiff has not stated a plausible equal protection claim based on the City's alleged failure to remove Shingle Mountain.

V.      **Conclusion**

For the reasons discussed above, the City's Motion to Dismiss [ECF No. 35] is GRANTED as to Plaintiff's constitutional claim.  Plaintiff's § 1983 claim against the City of Dallas is DISMISSED with prejudice, thereby resolving all pending claims in this case.

**SO ORDERED**.

August 4, 2021.

_____
BARBARA M. G. LYNN
CHIEF JUDGE